UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JAMES EDWARD GILMAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) 2:03-cv-44-WGH-RLY |
| VICTOR MANZO and DAVE BREWER, | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge, on the consent of the parties and the Order of Reference entered by District Judge Richard L. Young on March 4, 2005. (Docket No. 133). The Magistrate Judge conducted an evidentiary hearing at the Wabash Valley Correctional Facility on March 7 and July 6, 2005. The pro se plaintiff was present and was assisted by inmate Stephen Thompson. Defendants Brewer and Manzo were represented by counsel, Betsy M. Isenberg and Richard M. Bramer.

By order of February 24, 2005, District Judge Richard L. Young entered judgment dismissing plaintiff's due process claim but denied the motion for summary judgment as to plaintiff's equal protection claim. (Docket No. 128).

### Issues

This case, as tried, raises two distinct issues. The first issue is whether plaintiff's termination from employment in the "Wire Harness Shop" violated the

Equal Protection Clause of the Fourteenth Amendment. The second issue, raised by implication at the trial,[1] is that one or both of these defendants have failed to rehire him in violation of the Equal Protection Clause of the Fourteenth Amendment.

**Issue 1: Findings of Fact Relevant to the Issue of Plaintiff's Termination**

1. Plaintiff James Gilman ("Gilman") is an inmate at the Wabash Valley Correctional Facility ("WVCF"). Prior to his incarceration, Gilman served in the Navy where he received training as an electrician's mate, which included training in basic electronics, electrical systems, troubleshooting and maintenance. (Plaintiff's Exhibit 17). He also has a degree in avionics and performed technical electronic jobs prior to being incarcerated. Gilman is a person of mixed race, having one parent who is Native American and one parent who is Caucasian. (Plaintiff's Testimony).

2. Gilman began working in the Prison Industries' Wire Harness Shop beginning in February 2002. Gilman received good evaluations in February, April and June from his supervisors in the Wire Harness Shop. (Plaintiff's Exhibit 4).

3. Defendant David Brewer ("Brewer") was, between February and July 2002, the plant manager of that portion of the Prison Industries' programs that included the Wire Harness Shop. Brewer's duties included overseeing the day-to-day operations of the 26,000 square foot facility. He directly supervised four plant

---

[1] The court notes that this allegation is not explicitly included in plaintiff's Complaint.

foremen supervisors and indirectly supervised 26 other foremen in the plant. (Brewer Testimony).

4. The primary customer for the wire harness assemblies produced by Prison Industries is a company known as Hazelton Industries, Inc. ("Hazelton"). In late March and early April 2002, Brewer was advised by Hazelton personnel of an increase in the number of defective wire harnesses from previous production. Hazelton sent an engineer to the facility to do additional training with respect to the potential problems.

5. To Brewer's knowledge, the production problems in the Wire Harness Shop were corrected until the second week in June when he was notified of a "major crisis." (Brewer Testimony). The major crisis involved the fact that defects in the wire harnesses caused a number of end-of-line failures for one company who received the wire harnesses. The end-of-line failures had resulted in the destruction of manufacturing equipment at that company which had created an immense financial cost.

6. Upon receipt of that information, Brewer contacted the foreman supervisor of the Wire Harness Shop, Mark Wehrmeyer ("Wehrmeyer"), to stop all production for that company. During the second and third weeks of June 2002, all wire harnesses for the company were reinspected and other investigations were performed concerning how the defective wire harnesses had left the facility. (Gilman Testimony; Brewer Testimony).

7. On June 19, 2002, Brewer was notified by Hazelton that ten wire harnesses were discovered to have various defects. Of the ten, some were traced back to a particular offender as the assembler. (Plaintiff's Exhibit 3). Brewer directed Wehrmeyer and defendant Victor Manzo ("Manzo") to terminate from employment those responsible for the defective wire harnesses. (Plaintiff's Exhibit 3).

8. As early as June 21, 2002, Manzo terminated workers including Steven Thompson (Plaintiff's Exhibit 1) and Steven Wright (Plaintiff's Exhibit 15). Gilman was not terminated on that date.

9. As a part of the investigation, on June 28, 2002, Brewer received a report entitled "Non-Conforming Found at ALS-Ripon." (Plaintiff's Exhibit 5). That three page report detailed a number of failures found in wire harnesses produced at the facility and identified by a number the "operator" who was responsible for the production of the part. Gilman was identified as being involved with at least six of the failures listed on Gilman's Exhibit 5 as Operator 38.

10. Gilman was not, in fact, the operator who produced or "plugged" the defective wire harnesses (Exhibits C, D, E, F), nor was he a tester who could have been responsible for testing the harnesses before they left the Wire Harness Shop.

11. Upon receipt of Gilman's Exhibit 5, Brewer directed Manzo to terminate all persons identified on the "Non-Conforming" report (Exhibit 5) as operators. On June 28, 2002, Brewer ordered all persons identified as operators on Gilman's Exhibit 5 to be terminated, and he terminated Gilman on that date. (Plaintiff's

- 4 -

Exhibit 18). On that date, Gilman attempted to advise Brewer that he was not responsible for the errors that were found. (Plaintiff's Exhibit 18).

12. Brewer could have reviewed job tracking sheets to accurately determine which operators were actually at fault for the defective harnesses (Exhibits C, D, E), and Brewer could have concluded that other persons working in the Wire Harness Shop were causing more lost time than Gilman (Exhibits L, N). Brewer did not do any such investigation. His failure to perform such an investigation was not due to his intentional determination to discriminate because of race, but was rather due to his desire to take expedited action to satisfy the customer that further harnesses would not be produced by those persons who the customer had identified as producing defective products.

13. Although Brewer was mistaken about the role which Gilman played in the defective parts, he made his decision to fire Gilman based upon the mistaken belief that Gilman was responsible for the production of the parts. Brewer did not know the race of the individuals who were to be terminated prior to his decision to terminate them because he ordered the termination of those individuals identified by operator number on Gilman's Exhibit 5, and that document did not identify the race or name of the operator.

14. As a part of the termination process, Manzo filled out Gilman's Exhibit 12 on July 8, 2002, to document the decision to terminate Gilman. Manzo placed the information on the exhibit indicating sub-par work because of Manzo's belief that Gilman was responsible for the defects which had caused a unique and serious

crisis in the facility.  Neither Brewer nor Manzo intended to intentionally discriminate against Gilman based upon his race in their decision to terminate him on June 28, 2002.

15.  During the June and July 2002 time period, and as a result of the complaints concerning product quality at the Wire Harness Shop, eight individuals were terminated.  Of this number, only two white individuals were terminated, and the others who were terminated were black, Hispanic or of mixed race.  (Gilman Testimony; Thompson Testimony).

### Issue 2:  Findings of Fact as to Rehire

With respect to the issue of whether Gilman has had his rights under the Fourteenth Amendment violated by their refusal to rehire him, the evidence before this court consists primarily of research prepared by the Supervisor of Classifications, Trisha May, found at plaintiff's Exhibit B.  That information shows:

16.  During the period of January 1, 2001, through August 31, 2003, 12 black offenders were reclassified from the Wire Harness Shop, but four of those were later rehired into that shop or another shop in the Prison Industries area.

17.  One Hispanic offender was reclassified from the Wire Harness Shop and was not rehired back into the Prison Industries area.

18.  Ten white offenders were reclassified from the Wire Harness Shop during this time period, only two of which have been rehired back into the Prison Industries area.

19. With respect to Gilman's allegation that he has been refused re-employment because of his race, although Gilman's termination describes his release from the workplace as "permanent," under prison policies and procedures he is eligible for reconsideration of employment and reapplication after 90 days. (May Testimony).

20. Both Gilman and Steven Thompson applied to be rehired on four occasions since their terminations, but neither one of them has been rehired.

## Statement of the Law

To establish a prima facie case under the Equal Protection Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he: "(1) is a member of a protected class; (2) is otherwise similarly situated to members of the unprotected class; (3) suffered an adverse employment action; (4) was treated differently from members of the unprotected class; and (5) the defendant acted with discriminatory intent." *McPhaul v. Board of Commr's of Madison County,* 226 F.3d 558, 564 (7th Cir. 2000), *cert. denied,* 532 U.S. 921 (2001). With regard to the fifth element, a plaintiff must show that the defendant "acted with a nefarious discriminatory purpose, and discriminated against him based on his membership in a definable class." *Nabozny v. Podlesny,* 92 F.3d 446, 453 (7th Cir.1996) (internal citations omitted). "A showing that the defendants were negligent will not suffice." *Id.* at 454. Plaintiff "must show that the defendants acted either intentionally or with deliberate indifference." *Id.*

> [T]he Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination rather than erroneous or even arbitrary administration of state powers. The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation. Discriminatory purpose, however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group.

*Shango v. Jurich,* 681 F.2d 1091, 1104 (7th Cir. 1982) (citations and internal quotations omitted).

If plaintiff shows unequal treatment based on race, to escape liability the defendants must prove either that they did not discriminate against plaintiff, or at a bare minimum, the defendants' discriminatory conduct must satisfy the strict scrutiny standard of review. *Johnson v. California,* 125 S.Ct. 1141 (2005) (strict scrutiny standard applies to racial classifications).

### Issue 1:  Analysis as to Termination

With respect to plaintiff's termination, as the facts found above demonstrate, plaintiff is the victim of a decision to terminate him which is unfair in the general sense. While plaintiff has developed facts which show that he was not responsible for the defects in the wire harnesses, he has not demonstrated that defendant Brewer purposefully and intentionally discriminated against him in making his decision. As the law establishes, purposeful discrimination "implies that the decisionmaker singled out a particular group for disparate treatment and selected

his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Shango,* 681 F.2d at 1104. The facts in this case show that defendant Brewer made what might be considered to be an arbitrary decision. That is, without any sort of verification, Brewer accepted as true the representations on plaintiff's Exhibit 5 that certain inmates who were identified by operator numbers were responsible for the failures in the wire harness parts. The evidence before the court is that Brewer did not know the race of the individuals listed as operators who caused problems in the wire harness production area when he made his decision to terminate them. The evidence before the court suggests that Brewer made a hasty and incorrect decision, but there is no evidence that he singled out a particular racial group for the purpose of causing it adverse effects. Therefore, although plaintiff was terminated for reasons that were incorrect and which were arbitrarily determined by defendant Brewer, there is insufficient evidence to show that Brewer's decision was motivated by the race of those he terminated. This action does not violate the Fourteenth Amendment of the United States Constitution.

### Issue 2:  Analysis as to Rehire

Based on this evidence, there is an insufficient showing that non-Caucasian offenders are being returned to the shop work in any different manner than the Caucasian offenders. The court notes that certain documents reflect that inmates are "permanently" barred from returning to work; however, plaintiff has established that pursuant to the offender handbook for Level 3 and 4 inmates, under Article

10, Work Assignments, subsection 4(c), an offender may be removed from a work program upon receipt of a below average or unacceptable rating. The regulations provide that if there are insufficient documentation of below average or unacceptable ratings, the offender will be returned to the work line. While in this case there is little documentation that plaintiff's work performance was below average or unacceptable, there is no evidence that the failure to return him to work is the result of a decision by defendant Manzo to discriminate against him because of his race. The testimony from Manzo indicates that Manzo's intent or belief was and continues to be that plaintiff played some role in the unsatisfactory production of wire harnesses at a critical time in June. Although Manzo's belief in that matter may be mistaken, there is insufficient evidence that Manzo has known that his opinions as to plaintiff's performance were in error prior to the date of this trial, and that he has refused to return plaintiff to his work assignment because of his race. Therefore, plaintiff has not proven by a preponderance of the evidence that defendant Manzo refuses to return him to the work line in violation of his rights under the Equal Protection Clause. While the evidence brought forward in this case, when called to the attention of the current hiring authority, might suggest that plaintiff's prior work performance was adequate, this is a matter that must be addressed through the current prison grievance procedure. Plaintiff is encouraged to seek reapplication for the position in the future, buttressed by the facts which he has developed indicating that he was not personally responsible for defective performance at the time of his last termination.

**Conclusion**

For the reasons specified above, plaintiff has failed to prove by a preponderance of the evidence that his rights under the Equal Protection Clause of the Fourteenth Amendment have been violated. Therefore, plaintiff's case is **DISMISSED, with prejudice.**[2]

**SO ORDERED.**

**Dated:** 09/06/2005

                                                                                    _____
                                                                                    WILLIAM G. HUSSMANN, JR.
                                                                                    Magistrate Judge

**Mail Copy to:**

James E. Gilman
DOC # 110906
Wabash Valley Correctional Facility
P.O. Box 1111
Carlisle, IN 47838

**Electronic copies to:**

Richard M. Bramer
INDIANA STATE ATTORNEY GENERAL
rbramer@atg.state.in.us

Betsy M. Isenberg
INDIANA STATE ATTORNEY GENERAL
bisenberg@atg.state.in.us

---

[2]Although plaintiff has not specifically articulated a § 1981 claim either in his pleadings or at trial, the court notes that even if alleged, a § 1981 claim asserted under either a disparate treatment or a disparate impact theory, would fail. A disparate treatment claim would fail for the same reason as has plaintiff's equal protection claim; that is, that plaintiff failed to establish intentional discrimination. *Franklin v. City of Evanston,* 384 F.3d 838, 848 (7th Cir. 2004), *cert. denied,* 125 S.Ct. 1696 (2005). A § 1981 claim based on allegations of disparate impact would fail as a matter of law. *Id.* ("[E]qual protection claims, like § 1981 claims, require a showing of discriminatory treatment and cannot be supported by proof of disparate impact.").